### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-006 (DLF)** |
| **v.** | : | |
| | : | |
| **JOHN LIVINGSTON,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the Defendant, John Livingston, to 9 months of incarceration—an upward variance of 3 months from Livingston's guidelines range—followed by 12 months of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.    Introduction

Defendant John Livingston, a 52-year-old machinist, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Livingston pleaded guilty to violations of 18 U.S.C. §§ 1752(a)(1) and (2). The government's recommendation is supported by Livingston's demonstrated intent to use force to halt the certification of the 2020 presidential election results, as well as his support of further political violence even after January 6.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Livingston's crime support a sentence of 9 months of incarceration in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 34.

### Livingston's Preparation for the January 6, 2021 Riot

Beginning in November 2020, Livingston repeatedly used social media to express his view that the presidential election had been stolen. On Facebook, he shared conspiracy theories about mail-in-voting fraud and the software used in voting equipment. Livingston also shared articles describing efforts in various states to submit "alternate" slates of electors to Congress. By mid-December 2020, Livingston was urging then-President Trump to "DECLARE MARTIAL LAW," alleging that Democrats were engaged in "treason" and committing a "coup."

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

During this time frame, Livingston closely followed the news related to the election, but also to Congress more generally. In addition to sharing the above-mentioned information about efforts to submit alternate slates of electors to Congress, Livingston followed legislation passed by Congress. On December 29, 2020, for example, he posted to Facebook to parrot the false claim that members of Congress had given themselves a salary increase in a COVID-19 relief bill that had recently passed.

As January 6, 2021 approached, Livingston posted a series of TikTok videos expressing his intent to participate in demonstrations in Washington, D.C. on January 6. For example, on December 28, 2020, he posted a video using a filter that created the appearance of blue flames surrounding his face. Text superimposed upon the image reads: "Jan6th were taking the country back". *See* Image 1. The next day, on December 29, 2020, Livingston also posted to his Facebook page, saying "WHO ELSE IS GOING TO RALLY TO DC JANUARY 6TH!"



*Image 1: Screenshot of video posted to Livingston's TikTok account on December 28, 2020*

In his social media posts, Livingston communicated that he anticipated violence on January 6, likening the day to a war. For example, on January 3, 2021, Livingston posted a TikTok video with the text: "JAN6TH.. WE GO TO BE FREE PEOPLE! I GO FOR OUR CHILDREN." The video is underscored with music that repeats a refrain of "Let's go to war." *See* Gov. Sent. Ex. 1. On January 2, 2021, Livingston commented on a TikTok video, saying, "jan6.. we chanting or we taking the capital n holding it?" The next day, he made another comment: "marching alone will do nothing..yal know it will take blood. im [sic] go to dc to be free!" And, while Livingston was aware that he could not bring a gun with him to D.C., he wanted to be prepared for the violence he anticipated. So, in a January 3, 2021 TikTok comment, he asked "whats allowed…ik[2] guns arent…self protection of course but knives bear spray. mace…im stapling my flag to my baseball bat."

*Livingston's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Livingston attended the "Stop the Steal" rally at the area near the White House known as the "Ellipse." Livingston posted a photograph of himself at the rally to his Facebook page on January 6, 2021. *See* Image 2. The photograph shows Livingston carrying an American flag, which, although not stapled to a baseball bat, was attached to what appears to be a large white pipe. Shortly before 1:00 p.m., Livingston added a comment: "There's talk about storming the C…"

---

[2] The government understands "ik" to be a common abbreviation for the phrase "I know."



*Image 2: Photograph posted to Livingston's Facebook account on Jan. 6, 2021 and Accompanying Comments, with Comment by Livingston Highlighted in Red Rectangle*

After attending the rally, Livingston walked along Constitution Avenue and, later, Pennsylvania Avenue toward the U.S. Capitol. Livingston then entered the restricted grounds of the Capitol near the Peace Monument. ECF No 34 at ¶ 10. Livingston has admitted, in the stipulated Statement of Offense, that he knew at the time he entered U.S. Capitol grounds that he did not have permission to be present on the grounds. *Id.* at ¶ 11. Nevertheless, Livingston continued to advance toward the Capitol building and eventually made his way to the West Plaza near the base of the Capitol building.

While on and near the West Plaza, Livingston heard people loudly chanting. He also saw police officers guarding the Capitol—including at the northwest stairs—and saw plumes of tear gas billowing in the air. *See* Gov. Sent. Ex. 2 at 00:09.

Livingston posted on Facebook multiple times throughout the day of January 6, commenting on the conditions he was experiencing while on Capitol grounds. In one post, he wrote, "Tear gas is a joke." He further commented on this post "it had A smokey flavor," in reference to the tear gas. In another Facebook post, Livingston wrote, "Congress shooting flairs for distress call. Too late now bitches." *See* Image 4.



*Image 4: Screenshot from Livingston's Facebook page on January 6, 2021*

Eventually, the mob on the Capitol's West Plaza began to push past the police officers at the northwest stairs. Livingston then climbed on top of a railing alongside these stairs and waved

an American flag toward the crowd. *See* Image 5. Nearby, tear gas filled the air and the mob repeatedly attacked the police line that had formed across the Capitol's West Plaza. *See* Gov. Sent. Ex. 3.



*Image 5: Open-source photograph, with Livingston circled in red*

Livingston continued up the stairs to the Upper West Terrace. A TikTok video Livingston later posted on January 9, 2021 shows the line of police officers Livingston and the other rioters encountered on the Upper West Terrace. *See* Gov. Sent. Ex. 2 at 00:08. Eventually, however, Livingston and the other rioters made it past these officers and proceeded to the Senate Wing Door. There, Livingston entered the Capitol building at 2:21 p.m.—approximately nine minutes after the initial breach of the Capitol building, which had occurred at that door. *See* Image 6. At the time of his entry, shattered glass was on the ground, and a high-pitched siren blared.



*Image 6: Screenshot from U.S. Capitol CCTV, with Livingston circled in red*

After briefly remaining in the area just inside the Senate Wing Door, Livingston began walking south toward the Crypt at approximately 2:24 p.m.

Livingston has acknowledged that he understood that members of Congress and Vice President Pence were at the Capitol that day to participate in the Certification of the Electoral College vote. ECF No. 34 at ¶ 17. In fact, just before entering the Crypt, Livingston recorded a video in which he stated, "Pence fucked us. . . He refused to do it," in apparent reference to the certification. *See* Gov. Sent. Ex. 4. Also while in this area, other rioters near Livingston were shouting "NANCY, NANCY," in reference to Speaker of the House Nancy Pelosi. *Id.*

Livingston advanced further into the Capitol building and entered the Crypt. While there, Livingston heard the crowd chanting "STOP THE STEAL" and "WHOSE HOUSE? OUR HOUSE." *See* Gov. Sent. Ex. 5. While in the Crypt, Livingston used his cellular phone to film the events around him and even, at one point, take a phone call. *See* Image 7; Gov. Sent. Ex. 5 at 00:11–00:16.



*Image 7: Screenshot from open-source video footage, with Livingston circled in red*

At approximately 2:31 p.m., Livingston left the Crypt and returned to the area near the Senate Wing Door at approximately 2:32 p.m. While there, he saw numerous U.S. Capitol Police officers working to secure the area. Livingston then exited the Capitol building through a broken window next to the Senate Wing Door at approximately 2:34 p.m. *See* Image 8.



*Image 8: Screenshot from U.S. Capitol CCTV, with Livingston circled in red*

*Livingston's Statements After Leaving the Capitol*

At some point during the day on January 6, Livingston uploaded a selfie of himself to Facebook, making it his profile picture. *See* Image 3. Someone commented on the photograph, "You need bail?" After leaving the Capitol building, Livingston replied "Probably. Lol.", apparently recognizing that his conduct that day had been illegal.



*Image 3: Screenshot of Selfie that Livingston posted to his Facebook account on Jan. 6, 2021, and Accompanying Comments*

Later that evening, Livingston took to Facebook to give a "first hand account of capital building takeover." Livingston laid out what, in his view, was the cause of the riot: "STOLEN ELECTION WAS THE CAUSE. . . . PENCE FUCKING US WAS THE CAUSE." Livingston went on to suggest that more violence would be necessary to "TAKE OUR GOVERNMENT BACK," announcing "FUCK PEACE ITS TIME FOR WAR!" On TikTok, Livingston warned: "I was there..I was inside…believe me..Biden this was the beginning. u just woke up the Patriot in us all!"

Livingston's violent rhetoric continued beyond January 6. In a January 9 TikTok comment, Livingston expressed frustration with calls for nonviolent protest, saying he was "so tired of hearing no violence..we need to get violent with congress." He was especially frustrated with those who, in his view, did nothing but *complain* about the election being stolen, saying in a January 11 Facebook post: "how the hell do peoe [sic] think this was gonna play out.its straight up revolution or nothing." In contrast to those who complained about the election but took no action, Livingston proudly declared his commitment to what he saw as a revolutionary cause: "No change has ever happened without sacrifice n blood shed…and I've got 5pints to for [sic] the cause." And, in a January 17 TikTok comment, Livingston clarified exactly who should expect this bloodshed: "you think Congress is ever gonna change without blood shed"?

Despite these frustrations, Livingston was prepared to engage in future criminal conduct to achieve his political aims. In a January 9, 2021 TikTok comment, he emphasized that his next attempt would be more successful: "we need to organize. so *when we take capital again* we speak with one voice not hundreds of oponions [sic]!" (emphasis added)

*The Charges and Plea Agreement*

On January 3, 2024, the United States charged Livingston by a five-count Indictment with violating 18 U.S.C. §§ 1512(c)(2) and 1752(a)(1), (2) and 40 U.S.C. §§ 5104(e)(2)(D), (G). On September 16, 2024, pursuant to a plea agreement, Livingston pleaded guilty to Counts Two and Three of the Indictment, charging him with violations of 18 U.S.C. §§ 1752(a)(1) and (2). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Livingston now faces a sentencing for violating 18 U.S.C. §§ 1752(a)(1) and (2). As noted by the plea agreement and the U.S. Probation Office, the defendant faces, for each count, up to

twelve months of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV. The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR for Count Three. PSR at ¶¶ 49–57. The PSR did not provide a Sentencing Guidelines calculation for Count Two, but, pursuant to the plea agreement, the parties have agreed that the following calculation applies to that count:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

As the PSR notes, however, Counts Two and Three group, and the applicable offense level for that Group is the highest offense level of the counts in the group—in this case, Count Three.

U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The U.S. Probation Office calculated Livingston's criminal history as a category I. PSR at ¶ 64. Accordingly, the U.S.

Probation Office calculated Livingston's total adjusted offense level, after acceptance and application of 4C1.1, at 6, and his corresponding Guidelines imprisonment range at zero to six months. PSR at ¶¶ 125. Livingston's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

### A.  Upward Variance

After determining the defendant's Guidelines range, a court then considers any variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Livingston's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court vary upwards from the top of the Guidelines range.

Livingston was an avid and willing participant in an unprecedented crime. He joined a mob that resulted in more than 2.9 million dollars in losses, interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred police officers, and threatened the lives of legislators and their staff. (And, in fact, Livingston celebrated this threat to members of Congress, responding to their distress with "Too late now bitches!") His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Livingston "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent. Tr. 9/22/22 at 86-87.

But nothing in this defendant's Guidelines calculation reflects these facts. Livingston would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[3] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. As this Court has correctly noted, "simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-cr-116 (DLF), Sent. Tr. at 85. So a sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-cr-75 (RDM), Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to

---

[3] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

- "The security breach forced lawmakers to hide inside the House gallery until they could be evacuated to undisclosed locations. In short, the rioters' actions threatened the peaceful transfer of power, a direct attack on our nation's democracy." *United States v. Fitzsimons*, 21-cr-158 (RC), Sent. Tr., at 85-86.

- "But what a dangerous precedent the attack on January 6 set. What a Pandora's Box it opened. We still don't [know] how corrosive it will prove to be to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power. *United States v. Sparks*, 21-cr-87 (TJK), Sent. Tr. at 94.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-cr-157 (TNM), 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287 (TNM), 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-cr-513 (RBW), 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-cr-618 (ABJ), 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-cr-244 (TNM), 5/8/23 Sent. Tr.

Because the seriousness of Livingston's crime is not adequately captured by the applicable Guideline, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). Courts in this district have varied upward from the advisory guideline range in many January 6 cases specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See, e.g., United States v. Reffitt,* 21-cr-32 (DLF), Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other

judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-cr-638 (TJK), Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[4]

While, post-*Fischer*, Livingston no longer faces a charge of violating 18 U.S.C. § 1512(c)(2), "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety." *United States v. Hostetter*, 21-cr-392 (RCL), ECF 507, Sent. Tr. at 4-5 (cleaned up). And here, Livingston's serious conduct includes, as described in more detail below, his intent to use force to stop Congress from certifying the election results.

Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that

---

[4] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-cr-708 (RCL), ECF 151, Sent. Tr. at 5 ("Nothing about *Fischer* . . . bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-cr-6 (TJK), Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.").

In past sentencings, this court has made clear its view that January 6 was an "unprecedented attack" and that "the actions of the individuals who participated in the January 6 events undermine the rules of law and democracy." *United States v. Creek*, 21-cr-645 (DLF), Sent. Tr. at 57. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[5]

In this case, the government submits that an upward variance of 3 months is warranted to reach an appropriate sentence. As discussed below, similarly situated defendants have received comparable—or even higher--sentences.

---

[5] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

### V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of a sentence of 9 months of incarceration followed by 12 months of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Livingston's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Perhaps the most important factor in Livingston's case was his intent—as evidenced through his statements before, during, and after January 6—to deploy and encourage violence in order to achieve his political goal: halting the certification of the 2020 presidential election results.

This memorandum has laid out, at length, the various statements Livingston made in advance of January 6 to demonstrate this intent. Livingston's social media posts establish not only that he believed the election was stolen, but also that he was closely following (often false) news about the election and its certification. As January 6 approached, he planned for violence and prepared for what he viewed as war—even going as far as researching what types of weapons he could bring with him to D.C. And, unlike many January 6 defendants, who allege they had no intention of going to the Capitol on January 6 and simply got caught up with the crowd, Livingston

was contemplating "taking the capital n holding it" as early as January 2, 2021. All this was done for a purpose: to stop Congress from certifying President Biden as the winner of the 2020 presidential election.

Even though Livingston did not personally engage in acts of violence on January 6, he came to the Capitol with the intent to use force as a means of achieving a political end. Livingston celebrated others' use of violence and lent his physical presence to the force of the mob. He was near the forefront of the mob as it broke past police lines and advanced up the northwest stairs. Three days later, Livingston posted a triumphant TikTok video showing the police line that he and other rioters then breached at the top of those stairs. *See* Gov. Sent. Ex. 2 at 00:08. And, rather than show any empathy for the lawmakers and staffers who were sheltering for safety on January 6, Livingston mocked their fear, posting to Facebook: "Congress shooting flairs for distress call. Too late now bitches." Livingston celebrated this violence and fear because, in his view, that was the entire point: to use force to stop Congress and Vice President Pence from certifying the election results. This specific, violent intent to disrupt "the most sacred day in our democracy," *United States v. Wyatt*, 23-cr-215 (RDM), Sent. Tr. at 44, sets Livingston apart from many misdemeanants that this Court, and others in this district, have sentenced for their actions on January 6.

Another important factor in this case is the timing and location of Livingston's entry into the Capitol Building—which, in many ways, further demonstrates Livingston's commitment to halting Congressional proceedings. Livingston was at the forefront of the attack on the Capitol building, entering the Senate Wing Door mere minutes after the very first breach of the Capitol building occurred there. (And, in fact, images posted to Livingston's TikTok suggest he was even closer to the front of the crowd earlier, when it faced off against police at the top of the northwest stairs. *See* Gov. Sent. Ex. 2 at 00:08.) This Court is well aware of the size of the mob that gathered

on the Capitol's West Plaza on January 6. Despite this massive crowd and the police line that was stretching across the West Plaza at the time, *see* Gov. Sent. Ex. 3, Livingston was determined to "tak[e] the capital n hold[] it." So, he worked his way to the front of the crowd and joined the vanguard of rioters leading the effort to storm the Capitol.

Moreover, when Livingston entered the Capitol, sirens blared, shattered glass covered the ground, and—as he began to wander toward the Crypt—he heard other rioters ominously calling out for Nancy Pelosi. Despite all these signs he should not be there, Livingston not only remained in the Capitol Building, but he also ventured further toward the Crypt, filming and taking photographs as he went. And, while Livingston remained inside the building only for approximately 13 minutes, that's hardly surprising: he apparently learned while near the Crypt that his goal of preventing the certification had, to his knowledge, already failed. ("Pence fucked us… He refused to do it.") The egregious circumstances of Livingston's entry into the Capitol Building demonstrate a significant disregard for the law and counsel in favor of a term of incarceration.

Accordingly, the nature and the circumstances of this offense establish the clear need for a substantial sentence of incarceration in this matter.

### B. Livingston's History and Characteristics

As set forth in the PSR, Livingston recently underwent surgery "to repair his biceps and tendons, as well as to grind some bone spurs." PSR ¶ 95. He reports, however, that his recovery is going well. *Id.* Other than a diabetes diagnosis, which Livingston manages with medication, PSR ¶ 96, Livingston reports no other physical, mental, or emotional health issues. He describes his upbringing and childhood as "great," PSR ¶ 87, and he has been in a stable relationship with his wife for approximately 20 years. PSR ¶ 90. Livingston has been consistently employed over the past 34 years, currently working as a Machinist at Imperial Machine Co., in Richmond, Virginia.

PSR ¶ 106–109. In short, nothing in Livingston's personal history and characteristics provides mitigation for his criminal conduct on January 6, 2021.

Throughout his adult life, however, Livingston has had multiple run-ins with law enforcement. The PSR lists five prior convictions, with the first occurring when Livingston was 19 years old and the most recent (other than the present offense of conviction) occurring when he was 38 years old. PSR ¶¶ 59–63. Two of these convictions—including the most recent—were for misdemeanor assault charges. PSR ¶¶ 60, 63. While the government concedes that these convictions do not qualify for criminal history points under the Guidelines, they are still relevant aspects of Livingston's history for the Court to consider under Section 3553(a).

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a substantial term of incarceration.

First, although Livingston accepted responsibility by stipulating to all of the facts underlying his crimes of conviction and resolving his case via a plea agreement, his post-January 6 statements raise serious concerns about his desire to engage in political violence when democratic processes do not achieve his desired result. Despite telling the U.S. Probation Office ("USPO") that he "realized [his] decision was not the best decision [he'd] ever made and left immediately," PSR ¶ 42, Livingston continued to call for political violence long after exiting the Capitol building. In the days that followed January 6, he specifically decried others who wanted to pursue peaceful paths to obtain their preferred political outcomes, saying that "its [sic] straight up revolution or nothing." And, in fact, Livingston went as far as stating that he would recidivate, commenting on TikTok about the need to be more organized "when we take capital again." These

statements should be taken seriously, and they demonstrate that this Court's sentence must specifically deter Livingston from future political violence.

Second, even Livingston's statement in the PSR shows little remorse for his actions and is belied by the evidence in this case. For example, Livingston says that he merely "got caught up in what was going on" at the Capitol. *Id.* But that is hard to square with Livingston's numerous statements prior to January 6 showing that he was coming to the Capitol prepared for war and anticipating violence. Rather than express any remorse for the effect of his, and other rioters', actions on our lawmakers or on the police that protected the Capitol on January 6, Livingston simply regrets that his decision to go into the Capitol building "solved nothing." *Id.* Put another way, Livingston's only regret is that he did not ultimately achieve his political goals. The Court should therefore view any remorse Livingston expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Finally, although the government concedes that none of Livingston's past convictions qualify for criminal history points under the guidelines, his numerous past convictions show a heightened need for specific deterrence. The five convictions listed in the PSR, ¶¶ 59–63, cover a significant portion of Livingston's adult life, from 1991 to 2010, and include assault convictions. His criminal conduct in 2021 shows continued decisions to violate the law, suggesting that additional punishment is needed to deter him specifically from future criminal activity.

23

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[6] While this Court must sentence Livingston based on his own conduct and relevant characteristics, it must also, consistent with 18 U.S.C. § 3553(a)(6), "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. No previously sentenced case contains the same balance of aggravating and mitigating factors present here. However, this Court and others in this district have previously sentenced defendants who espoused violent rhetoric with the goal of disrupting the electoral certification, even if they did not personally engage in any acts of violence on January 6. While both cases cited below involved a pre-*Fischer* conviction under 18 U.S.C. §1512(c)(2)—and therefore a higher guidelines calculation than the present case—the defendants' *conduct* were substantially similar to Livingston's offense conduct, making them appropriate comparators under § 3553(a)(6).

In *United States v. Rahm*, 21-cr-150 (RJL), the defendant posted selfies and other statements to social media while at the Capitol on January 6, such as, like Livingston, commenting on the effects of chemical irritants. Like Livingston's references to Vice President Pence's role in the certification, the defendant in *Rahm* commented on the "vote" that was scheduled to occur in

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Congress that day. And, in fact, Rahm spent even less time inside the Capitol building that Livingston—11 minutes—and did not employ rhetoric as violent as Livingston's. However, unlike Livingston who entered the Senate Wing Door shortly after its breach, Rahm was part of the group that first breached the East Rotunda Doors, directly witnessing other rioters' violence toward officers guarding that doorway. And, unlike Livingston, Rahm took his case to trial and did not accept responsibility. Judge Leon ultimately sentenced Rahm to 12 months' incarceration. Given the similarities between *Rahm* and the present case, while also accounting for their differences, the government's recommended sentence of 9 months would not create an unwarranted sentencing disparity.

In *United States v. Calhoun*, 21-cr-116 (DLF), this Court sentenced the defendant to 18 months' incarceration. Like Livingston, Calhoun took to social media before January 6, describing that day in terms of war and revolution and discussing which weapons might be allowed in Washington, D.C. And, like Livingston, Calhoun posted on social media throughout the day on January 6, describing the chemical irritants he experienced and celebrating the "hostile takeover" of the Capitol. Calhoun entered the Capitol building through the Senate Wing Door at 2:19 p.m.— just two minutes before Livingston—and remained inside the building just four minutes longer than Livingston. Just as Livingston's social media posts following January 6 contemplated "when we take capital again," Calhoun stated after January 6 that "somebody had to do it, okay? I would do it again a hundred times. . ." And, while both Livingston and Calhoun espoused violent rhetoric, it is notable that, unlike Livingston, Calhoun had no criminal history, let alone criminal convictions involving violence. However, Calhoun took his case to trial, where he testified falsely. Moreover, his career as a criminal attorney made his conduct on January 6 particularly egregious. On balance,

however, this case demonstrates that the government's recommended sentence would not create an unwarranted sentencing disparity.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Livingston must pay $500 in restitution, which reflects in part the role Livingston played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Livingston's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VII.   Fine

The defendant's convictions for violations of 18 U.S.C. §§ 1752(a)(1) and (2) subject him to a statutory maximum fine of $100,000 each for Counts Two and Three. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. §

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

**VIII.   Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Livingston to 9 months of incarceration followed by 12 months of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Livingston's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:      */s/ Sean J. Brennan*
SEAN J. BRENNAN
Assistant United States Attorney
NY Bar No. 5954128
601 D Street NW
Washington, DC 20530
Sean.Brennan@usdoj.gov
(202) 252-7125

*/s/ Matthew Beckwith*
MATTHEW BECKWITH
Assistant United States Attorney
DC Bar No. 90014452
601 D Street NW
Washington, DC 20530
Matthew.Beckwith@usdoj.gov
(202) 252-7109