UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **Case No. 1:24-cr-006 (DLF)** |
| ) | |
| **JOHN LIVINGSTON,** ) | |
| Defendant. ) | |
| _____ ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

As the Presentence Report ("PSR") accurately reflects, the offense in this case falls at or near the low end of the spectrum of offenders prosecuted in connection with the events of January 6, 2021. Mr. Livingston's conduct was entirely non-violent and involved no assaultive conduct or property destruction. As a result, he stands convicted of the two misdemeanor offenses of entering or remaining in a restricted building or grounds and disorderly conduct in such a building or grounds. He has clearly accepted responsibility and has zero criminal history points. He also maintains stable, long-term employment and provides a stable home for himself and his wife as well as their minor and adult children and a grandchild—seven people in all. In these circumstances, Mr. Livingston submits that a probationary sentence with, at most, a condition that he perform community service and/or serve a short period of home confinement is sufficient to accomplish the purposes of sentencing. Such a sentence is both within the advisory Guideline range and supported by the 18 U.S.C. § 3553(a) sentencing factors. Moreover, such a sentence is consistent with how

this Court and other Judges in this District have sentenced similarly situated offenders.

## I.     Legal Standard

At sentencing, this Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a) (emphasis added). Although this Court must calculate and consider the advisory Sentencing Guideline range applicable to Mr. Livingston's case, it must also independently assess the factors enumerated in 18 U.S.C. § 3553(a) to fashion an appropriate sentence "for the individual defendant."[1] *See Nelson v. United States*, 555 U.S. 350, 351-52 (2009) (reversing and remanding due to District Court's erroneous presumption that a within-Guidelines range sentence was reasonable).

---

[1] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

**II.     The 18 U.S.C. § 3553(a) Factors Support a Probationary Sentence With at Most a Condition of Community Service and/or a Term of Home Confinement as a Condition.**

*A.     Mr. Livingston's Personal History and Characteristics and the Nature and Circumstances of the Offense Support a Probationary Sentence.*

Mr. Livingston's personal history demonstrates that a probationary sentence is sufficient to accomplish the purposes of sentencing. In short, Mr. Livingston is a stable, productive and contributing member of his community with a supportive family who rely on him. He is a 52-year-old native of Richmond, Virginia, who has lived in and around Richmond his entire life. He has one son from a previous marriage, who is now a United States Marine, and two children from his current marriage—a 22-year-old son and a 13-year-old daughter. His wife also has two adult children and a grandchild. All of his and his wife's children (with the exception of Mr. Livingston's oldest son) live in the home owned by Mr. Livingston and his wife. Mr. Livingston has been steadily employed and has worked as a machinist for the last 34 years—his entire adult life. And, as already noted, he has zero criminal history points; while he has some criminal history, it consists entirely of misdemeanors that did not result in jail time and are too old to count under the Guidelines (all are 20-35 years old, save for one misdemeanor in 2010). Further, Mr. Livingston has been subject to conditions of release from this Court for over ten months, and has fully complied with those conditions.

Mr. Livingston's character is perhaps best summed up in the letter from his neighbor Kevin Clark (attached as Exh. A). Mr. Clark notes that he and Mr.

-3-

Livingston are unlikely friends given their "differing views on many things," but praises Mr. Livingston as a "stand-up guy" who, Mr. Clark believes, never would have traveled to Washington for the events of January 6, 2021, had he understood what would transpire that day. Moreover, Mr. Clark attests to Mr. Livingston's character as a "family man with a strong love for his family," and as a valued member of his local community:

> Over the years my health has deteriorated to the point where I can no longer perform tasks around the house. John is always very quick to volunteer his handyman services to help us out. He never asks for a dime and will do it on your time and not his. Whether it's replacing a ceiling fan, repairing my privacy fence, installing a new door and doing drywall work, John is there and willing to help a neighbor or member of the community. I've seen him pull pizza delivery drivers out of the ditch in front of his house on numerous occasions even though he was under no obligation to do so. If he saw someone with a flat tire on the side of the road, he is the type of person who will stop and help you instead of driving by.

Given all of this background, it should come as no surprise that Mr. Livingston's unlawful conduct on January 6 was short-lived and non-violent. After attending then-President Trump's rally at the Ellipse, he walked with the crowd toward the Capitol Building, as the President had just encouraged them to do. Once he got there, he entered and remained in the Capitol Building for approximately 13 minutes, from 2:21 p.m. until 2:34 p.m. By the time he entered, crowds had already pushed their way past police lines and into the building such that Mr. Livingston was able to walk in and out through an open door. He never engaged in violence, never destroyed any property, and was inside for only a few minutes. That is because Mr.

Livingston was there for what he believed would be a protest. He did not come with a helmet, a flak jacket or a gas mask. And he did not bring pepper spray, a baseball bat or brass knuckles. Rather, he was there to make his voice heard about an election he believed had been stolen—and, in the heat of the moment, in a fast-evolving situation in the middle of a large and volatile crowd, he made the terrible decision to enter a restricted area. As he explains it in his own words, he "got caught up in what was going on. I realized my decision was not the best decision I've ever made and left Immediately. Going inside the building was wrong. It was immature and solved nothing!" *See* PSR ¶ 42.

The government's contention that Mr. Livingston's sentence should be driven principally by "his demonstrated intent to use force to halt the certification of the 2020 presidential election results," *see* Government's Sentencing Memorandum (Dkt. No. 39) ("Gov. Memo") at 2, fails because it ignores the most glaring and obvious evidence of Mr. Livingston's intent—his conduct. It is true, of course, that Mr. Livingston's online posts expressed a bravado that went far beyond his actions on January 6. But his conduct that day makes clear that those statements were nothing more than empty talk. They did not "demonstrate his intent" (to use the government's words). If they did, his conduct would have included more than spending a few non-violent minutes inside the Capitol, and his preparations would have included more than driving to Washington and walking to the Capitol without any weapons. The defense submits that the Court should decline the government's request to sentence Mr. Livingston for what he said, and instead sentence him for what he did.

The government's other arguments for an upward variance are equally unconvincing because they apply equally to *all* January 6 cases, the vast majority of which did not result in an upward variance nor even a government request for one. For example, the government argues that the events of January 6 were of historic magnitude and imperiled democracy in a manner not captured by the Guidelines range. *See* Gov. Memo at 13-15. But that is true of *all* January 6 misdemeanor cases like Mr. Livingston's. Many of those cases are addressed below, and the vast majority of such cases received within-Guideline sentences (generally near the low end of the Guideline range), a fact the government seems to admit when it defends its sentencing request by noting that the avoidance of unwarranted sentencing disparities is "only one of several factors that must be weighed and balanced." *Id.* at 26 (quotations and citation omitted). Similarly, the government's focus on Mr. Livingston's online statements both before and after January 6 do not meaningfully distinguish this case from the comparator sentences addressed in subsection C below (or other cases involving the offenses at issue here), most of which involved online statements that far exceeded each individual defendant's relatively limited offense conduct. The same is true of the government's argument that Mr. Livingston saw and smelled tear gas, saw police trying to hold the crowd back, saw shattered glass on the ground, and heard a siren blaring. *See* Gov. Memo at 5-7. All of these facts apply to virtually every comparator case that has been resolved as a misdemeanor. The government simply fails to identify anything extraordinary about *this* case that justifies its extraordinary sentencing request.

### B. A Conviction and Probationary Sentence are Sufficient to Accomplish Both General and Specific Deterrence.

In these circumstances, a probationary sentence (perhaps with additional conditions such as a term of home confinement or a requirement to perform community service) is fully sufficient to accomplish the purposes of sentencing, including both general and specific deterrence. With respect to general deterrence, the Department of Justice and others have long recognized that there is little correlation between sentence severity and general deterrence. Rather, deterrence of the public is achieved by the credible threat of punishment as opposed to its severity. Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014). In fact, "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime." *Id.* at 1203; *see also* National Institute of Justice [a research agency of the Department of Justice], *Five Things About Deterrence* (Sept. 2014) ("The certainty of being caught is a vastly more powerful deterrent than the punishment."); Gary Kleck & J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinq. 1006, 1031-33 (2013) ("punishment levels do not routinely reduce crime through general deterrence mechanisms").

With respect to specific deterrence, as a 52-year-old defendant with zero criminal history points, data compiled by the Sentencing Commission indicates that Mr. Livingston presents a very low statistical risk of recidivism as compared to the

average offender. The Sentencing Commission's data establishes that increases in age are directly tied to decreases in recidivism. *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, December 2017, at 30 ("Among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released age 65 or older. The pattern is consistent across age groups, as age increases recidivism by any measure declined. Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average.") Moreover, as an offender with zero criminal history points, the Commission has found that Mr. Livingston presents a statistically low risk of recidivism even as compared to other offenders in CHC I, all of whom present a low recidivism risk as compared to the average offender. *See* United States Sentencing Commission *Recidivism and the "First Offender,"* May 2004, at 4-5 & Exh. 6.

  C. *The Sentence Requested Here is Consistent with Sentences Imposed Upon Similarly Situated Defendants Who Engaged in Similar Conduct.*

While there have been literally hundreds of sentences imposed on offenders who participated in the events of January 6, 2021—ranging from probation to decades in prison—a review of sentences imposed on non-violent offenders such as Mr. Livingston demonstrates that a probationary sentence of the type requested here is consistent with sentences imposed on similarly situated defendants. In *United States v. Hallon*, 1:22-cr-217, for example, this Court imposed a sentence of 24 months' probation with a requirement to perform 60 hours of community service upon the

defendant, who—according to the government's Sentencing Memorandum—was inside the Capitol Building for 14 minutes and (unlike Mr. Livingston) mischaracterized his actions that day to the FBI and never expressed remorse for his conduct.[2] Similarly, in *United States v. Rushing,* 1:23-cr-390, this Court imposed the same sentence on both defendants—two years' probation with a requirement to perform 40 hours of community service—who each entered the Capitol on two distinct occasions, who chased first responders attempting to evacuate Ashli Babbitt to an ambulance, and who provided false information to law enforcement about their conduct that day. *See also United States v. Williams*, 1:21-cr-45 (24 months' probation with 60 hours community service imposed upon defendant who penetrated the Capitol as far as the Speaker's offices); *United States v. Walden*, 1:21-cr-548 (36 months' probation with 60 hours of community service and 30 days' home detention imposed upon defendant who brought gas mask, scaled wall before entering Capitol, and entered the Capitol through a broken window); *United States v. Kostolsky*, 1:21-cr-197 (36 months' probation with 30 days' home detention imposed upon defendant who was only briefly inside Capitol, but scaled wall to get to Upper West Terrace, lied to the FBI about his participation, and deleted files from his phone); *United States v. Horvath*, 1:22-cr-344 (36 months' probation with 28 days' intermittent confinement imposed upon defendant who was in Capitol Building for approximately nine

---

[2] In each of the examples discussed here, the sentencing information is drawn from the Judgment and the facts are drawn from the government's Sentencing Memorandum.

minutes, who had 16 years of criminal history including a felony conviction, and who tested positive for substance use during pretrial release).³

      D.    *Mr. Livingston Will Suffer Significant Consequences Even with a Sentence of Probation—Including a Term of Supervision, a Requirement to Pay Restitution, and the Many Collateral Consequences of a Federal Conviction.*

As the Supreme Court has recognized, a sentence of probation does not allow an offender to escape punishment. Rather, it "substantially restrict[s] [an offender's] liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007) (affirming sentence of probation in light of post-offense rehabilitation where advisory sentencing range was 30-37 months). As the Court noted, those on probation typically "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly, . . . permit unannounced visits to their homes . . . refrain from excessive drinking," and abide by other standard and special conditions imposed by the sentencing judge. *Id.* at 48-49. The Court in *Gall* might also have noted that probation carries with it the threat of revocation, with the possibility of a significant prison sentence should one

---

³ It is true, of course, that the cases cited here are only examples, and that this Court has imposed more severe sentences upon certain defendants convicted of conduct similar to Mr. Livingston's. But those cases have typically involved aggravating facts not present here. *See, e.g., United States v. Robinson*, 1:22-cr-267 (6 months' incarceration imposed upon defendant who was convicted only of misdemeanor, but who—after plea agreement was entered—was discovered to have punched a police officer in the head during the events of January 6).

fail to comply—at any time over potentially a period of years—with all the conditions set by the court.

Further, Mr. Livingston will suffer significant collateral consequences as a result of this conviction, impacting his ability to obtain employment, government contracts or bank loans, among other things. As courts have long recognized, collateral consequences of conviction amount to an additional form of punishment that independently accomplish the purposes of sentencing and, as a result, are relevant to determining the minimum sentence that is sufficient but not greater than necessary under § 3553(a) to achieve those purposes. *See United States v. Jaime*, 235 F.Supp.3d 262, 265 (D.D.C. 2017) (imposing pre-judgment probation under 18 U.S.C. § 3607(a) in misdemeanor drug case in part as a result of collateral consequences of even a misdemeanor conviction, particularly with respect to future employment); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence"). Similarly, in imposing a variant probationary sentence upon a first offender in a drug-importation case, Judge Block of the Eastern District of New York emphasized the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> "There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. As Professor Michelle Alexander has explained, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'"

188 F. Supp. 3d 179 at 180 (internal citations omitted).

### III. The Discretionary Conditions of Probation Should Not Limit Mr. Livingston's Ability to Travel Domestically (with the Possible Exception of Travel to Washington, D.C.) and Should Not Infringe on His Second Amendment Rights.

Finally, Mr. Livingston objects to two of the discretionary conditions of probation suggested in the PSR.

First, with respect to the proposed condition that the probationer not leave the judicial district in which he resides without the permission of the probation officer (*see* PSR ¶ 139, item 3), Mr. Livingston submits that this condition is more restrictive than necessary to achieve the purposes of sentencing. Among other things, Mr. Livingston's adult son lives in North Carolina, and Mr. Livingston should be permitted to visit him without seeking permission from a probation officer. His stable residence and employment, and long-term compliance with conditions of pretrial release support a finding that his travel need not be restricted to the judicial district in order to achieve the purposes of sentencing. Accordingly, Mr. Livingston submits that the conditions of probation be drafted to permit domestic travel without advance permission of the probation officer, with the possible exception (should the Court

deem it appropriate) of requiring him to seek permission to travel to Washington, D.C.

Second, with respect to the proposed condition that Mr. Livingston not possess a firearm (*see* PSR ¶ 141 n. 2), Mr. Livingston submits that on the facts of this case, such a condition would violate his Second Amendment right to possess firearms. Mr. Livingston has no felony convictions, and the instant conviction involved non-violent misdemeanor conduct. While the PSR suggests that this condition be adopted for the protection of the probation officer, Mr. Livingston submits that there is an insufficient factual basis under *United States v. Rahimi*, 602 U.S. \_\_\_, 144 S.Ct. 1889 (2024), and *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022), to abridge his Second Amendment right to possess firearms in his home for the safety of himself and his family. Accordingly, Mr. Livingston objects to any condition of probation prohibiting his otherwise-lawful possession of firearms.

## CONCLUSION

For all the foregoing reasons, the defense respectfully submits that a sentence of probation, possibly with a term of home detention or a requirement to perform community service as a condition, is sufficient to achieve the purposes of sentencing in this case. Further, Mr. Livingston agrees with the Probation Office that he lacks the ability to pay a fine, particularly in light of the restitution obligation to which he has agreed. *See* PSR ¶ 122.

Respectfully submitted,

**JOHN LIVINGSTON**

By Counsel,
Geremy C. Kamens,
Federal Public Defender

By: _____/s/_____
Todd M. Richman
Lauren E.S. Rosen
Assistant Federal Public Defenders
Counsel for Mr. Livingston
1650 King Street, Suite 500
Alexandria, Virginia   22314
(703) 600-0800 (telephone)
(703) 600-0880 (facsimile)
Todd_Richman@fd.org
Lauren_Rosen@fd.org